UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



INV Accelerator, LLC,

        Plaintiff,

–v–

MX Technologies, Inc., *et al.*,

        Defendants.

19-CV-2276 (AJN)

OPINION
AND ORDER

ALISON J. NATHAN, District Judge:

    Plaintiff INV Accelerator, LLC ("INV"), a startup accelerator, alleges that one of its alumni, Defendant Vested Interest Co. (doing business as "GoldBean"), breached a contract and implied covenant of good faith when it failed to compensate INV after an alleged transaction with Defendant MX Technologies ("MX"). It also alleges GoldBean, MX, and GoldBean founder, Defendant Jane Barratt, were unjustly enriched in the process and that MX and Barratt tortiously interfered with the contract at issue. Defendants GoldBean and Barratt, in return, bring a number of counterclaims against INV, including declaratory claims, tortious inference with contract, tortious interference with prospective business advantage, and unfair and deceptive business practices. Before the Court is Defendant MX's motion to dismiss the claims against it and Plaintiff INV's motion to dismiss the counterclaims. For the reasons articulated below, MX's motion is granted, and INV's motion is granted in part and denied in part.

**I.    BACKGROUND**

    The following facts are drawn from the Complaint and Amended Counterclaims and assumed to be true for purposes of these motions to dismiss.

For six months starting in April 2016, GoldBean, a financial technology startup, was hosted by INV's accelerator program. Complaint ("Compl."), Dkt. No. 15, ¶ 6; Amended Counterclaims ("Amend. C.C."), Dkt. No. 55, ¶¶ 23, 28. INV claims that its accelerator program helps startup businesses with the "objective of developing and enhancing their products and/or services." Compl. ¶ 2; Amend. C.C. ¶ 16. GoldBean and INV executed a "Participation Agreement" whereby GoldBean agreed to "[i]ssue a simple agreement for future equity (a 'SAFE')" in the aggregate amount of $500,000 to INV and agreed that this SAFE would "be on reasonable and customary terms and documentation provided by [INV]." Compl. ¶ 7; Amend. C.C ¶¶ 24-25. At this point, the stories diverge.

INV claims that both parties to the participation agreement understood that the "'reasonable and customary terms' would be those set forth in the industry-standard model SAFE developed by Y Combinator," a leading tech accelerator. Compl. ¶ 8. It further alleges that on May 17, 2016, it delivered a draft SAFE with the following terms, "taken from the Model SAFE and supplemented by the Participation Agreement." Id. ¶ 9. First, that "GoldBean will automatically issue to INV a certain number of equity securities upon any Equity Financing that occurs before the expiration or termination of the SAFE, with Equity Financing defined as 'a bona fide transaction with the principal purpose of raising capital, pursuant to which [GoldBean] issues and sells Capital Stock at a fixed pre-money valuation with an aggregate sales price of not less than $20,000,000.'" Id. ¶ 9(a). Second, that "[a]t any time before the expiration or termination of the SAFE, INV may convert all or a portion of the Principal Amount ($200,000) into equity securities at the Conversion Price (defined therein)." Id. ¶ 9(b). Third, that "[u]pon notice of a Liquidity Event, INV may either (i) receive a cash payment equal to the Principal Amount ($200,000) or (ii) receive a number of shares of GoldBean common stock equal to the

2

Principal Amount ($200,000) divided by the Liquidity Price (defined therein). A Liquidity Event is defined in the SAFE to mean an initial public offering or Change of Control, which includes by definition 'any reorganization, merger or consolidation of [GoldBean]' and 'a sale, lease or other disposition of all or substantially all of the consolidated assets of [GoldBean].'" *Id.* ¶ 9(c). And fourth, that "[i]f there is a Dissolution Event before the expiration or termination of the SAFE, GoldBean will pay to INV the Principal Amount ($200,000) immediately prior to, or concurrent with, the consummation of the Dissolution Event. A Dissolution Event is defined in the SAFE to include (i) a voluntary termination of operations, (ii) a general assignment for the benefit of GoldBean's creditors and (iii) any other liquidation, dissolution or winding up of GoldBean (excluding a Liquidity Event), whether voluntary or involuntary." *Id.* ¶ 9(d). INV claims that GoldBean never raised an objection and in fact assented to the terms of this SAFE. *Id.* ¶ 10.

The Complaint further alleges that on September 7, 2018, Barratt sent to INV a draft press release to be issued the next morning announcing that MX would acquire GoldBean and that Barratt would be joining MX's executive team. *Id.* ¶ 11. Two days later, INV alleges that it notified GoldBean of its election "to receive the greater in value of (A) a cash payment equal to $200,000, or (B) a number of shares of [GoldBean's] common stock equal to $200,000 divided by the Liquidity Price (as defined in the SAFE)." *Id.* ¶ 12. INV allegedly sent a copy of this notice to MX. *Id.* INV next alleges that GoldBean and MX "purported to 'cancel' the would-be acquisition." *Id.* ¶ 13. Instead, the Complaint states that MX publicly issued a press release announcing its hire of Barratt. The press release was allegedly "nearly identical" to the earlier draft, with references to "GoldBean" swapped out for "Jane [Barratt]." *Id.* ¶ 14. INV also alleges that Barratt transferred GoldBean's assets to MX, and that GoldBean is now a "defunct

3

shell." *Id.* ¶ 13. The Complaint further claims that "[t]here was no business purpose for restructuring the transaction this way," and that "MX and Barratt acted solely to prevent Plaintiff from receiving the equity and/or cash payments it was entitled to under the Participation Agreement." *Id.* ¶ 38. INV claims that it has not been paid what is owed to it under the SAFE. *Id.* ¶ 15.

GoldBean and Barratt tell a different story. While they agree that the Participation Agreement included the promise of a SAFE on reasonable and customary terms, GoldBean and Barratt claim that the Participation Agreement explicitly stated that INV would be entitled to an equity stake upon GoldBean's first $20,000,000 equity raise. Amend. C.C ¶¶ 24-25. GoldBean and Barratt also allege that INV waited until late August of 2016 to proffer the SAFE at issue (which they refer to as the "Proffered Equity Agreement"), and that at the same time, INV proffered a second equity agreement that would grant INV's partner, Fiserv, the same rights. Amend. C.C ¶¶ 29-30. GoldBean and Barratt dispute that the terms of the SAFE were reasonable and customary, and allege that they rejected and did not sign either agreement. *Id.* ¶ 26-27, 31-32. They further allege that INV and its CEO, JJ Hornblass, were aware of the rejection. *Id.* ¶ 33.

In May of 2018, GoldBean and Barratt allege that Barratt accepted an offer to join MX, and that GoldBean shut down in July 2018 because it was not a viable business. *Id.* ¶¶ 34-37. The Amended Counterclaims further state that "[i]n connection with its offer to hire Barratt, MX agreed to acquire the assets of GoldBean in exchange for the equivalent of rights to approximately $100,000 in MX stock, to be paid in the future, on specified conditions, to the investors in GoldBean" excluding Barratt and the other GoldBean founder. *Id.* ¶ 39. As part of the agreement between MX and GoldBean, Barratt would both assume $40,000 of corporate debt

personally guaranteed by her and write off several hundred thousand dollars in loans she had made to GoldBean. *Id.* ¶ 41. The Amended Counterclaims also allege that "[s]eparately, MX and Barratt negotiated and signed an employment-at-will agreement (the 'Barratt Employment Agreement') under which Barratt would become an employee of MX" and her compensation would be calculated in a manner "entirely unrelated to GoldBean." *Id.* ¶ 42. GoldBean and Barratt claim that Barratt spoke with INV CEO JJ Hornblass multiple times from May through July 2018 about these agreements, and that he never mentioned any intent to enforce rights under the SAFE. *Id.* ¶¶ 43, 44.

After INV was sent the draft press release, the Amended Counterclaims allege that Hornblass, on behalf of INV, sent a letter via email to MX board members, executives, lower-level employees, and the personal email address of one MX C-suite executive. *Id.* ¶ 51, 58. The letter "purported" to assert INV's rights under the SAFE. *Id.* ¶ 58. But GoldBean and Barratt claim that it was sent with the "wrongful intent to bully and intimidate" MX into "abandoning its relationship" with GoldBean and Barratt, and "to seize for themselves the perceived economic benefits that INV would have been entitled to had GoldBean fallen for INV's trap and signed the Proffered Equity Agreement." *Id.* ¶¶ 53-55. The Amended Counterclaims allege that Hornblass did this despite knowing that GoldBean and Barratt were not bound by the SAFE or "Proffered Equity Agreement." *Id.* ¶ 58. Because of Hornblass's letter, the Amended Counterclaims allege that MX abandoned its intent to acquire GoldBean and in fact did not acquire GoldBean. *Id.* ¶¶ 64-67.

## II. LEGAL STANDARD

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555. Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* The Court must accept the allegations in the complaint as true and draw all reasonable inferences in the non-movant's favor. *ATSI Communs, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## III. DISCUSSION

### A. INV's Unjust Enrichment Claim Against MX Is Dismissed

INV claims that MX was unjustly enriched by what it sees as MX's de facto acquisition of GoldBean. To plead an unjust enrichment claim under New York law, "the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Georgia Malone & Co., Inc. v Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (quotation omitted). "The theory of unjust enrichment lies as a quasi-contract claim." *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (quoting *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005)). To succeed on an unjust enrichment claim, the plaintiff must have "a sufficiently close relationship with the other party." *Georgia Malone*, 973 N.E.2d at 746. This relationship need not amount to privity. *Id.* Nor does it have to be a "direct relationship." *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018). But it cannot be "too attenuated" either. *Georgia Malone*, 973 N.E.2d at 747. The New York Court of Appeals has held that a relationship is too attenuated for purposes of an unjust enrichment claim when the plaintiff and defendant "simply had no dealings with each

other." *Id.; cf. Myun-Uk Choi*, 890 F.3d at 69 (unjust enrichment claim properly pled where plaintiffs "alleged it to be a near statistical certainty that they directly traded with Defendants . . . during the relevant period").

The unjust enrichment claim against MX must be dismissed because the Complaint does not allege that MX had "dealings" or really any relationship with INV. *Georgia Malone*, 973 N.E.2d at 747; *see also Cohen v. BMW Invs. L.P.*, 668 F. App'x 373, 374 (2d Cir. 2016) (unjust enrichment claim properly dismissed where complaint did "not plead any relationship between [plaintiff] and [defendant] whatsoever"). Indeed, the Complaint does not even allege any contact between INV and MX, aside from INV's provision to MX of a copy of the notice it sent to GoldBean after learning about the planned acquisition. *See* Compl. ¶ 12. But "mere knowledge" does establish a relationship between the parties that is sufficiently close to justify imposing a quasi-contract. *Georgia Malone*, 973 N.E.2d at 747. INV "alleges only a relationship between [itself] and [GoldBean and Barratt], and a separate relationship between [GoldBean and Barratt] and [MX], which is too attenuated" to support an unjust enrichment claim. *Schroeder v Pinterest Inc.*, 17 N.Y.S.3d 678, 690 (N.Y. App. Div. 2015). The authorities cited by INV predate the New York Court of Appeals' decision in *Georgia Malone*, as well as *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110-11 (N.Y. 2011) and *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007), all of which clarified the law on unjust enrichment. *See In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 272 (S.D.N.Y. 2019). INV's unjust enrichment claim against MX must therefore be dismissed.

B.   **INV's Tortious Interference With Contract Claim Against MX Is Dismissed**

INV also brings a tortious interference with contract claim against MX. To state a tortious interference with contract claim under New York law, INV must allege "(1) 'the

existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)).

INV's tortious interference claim against MX fails because INV does sufficiently plead that MX "intentionally procured" GoldBean's alleged breach or even caused it. *Id.* The Complaint states that MX "improperly caused GoldBean to breach the Participation Agreement when [MX and Barratt] purported to 'cancel' the anticipated Acquisition and MX hired Barratt as its Chief Advocacy Officer, who then transferred GoldBean's assets to MX, leaving GoldBean a defunct shell." Compl. ¶ 38. It further states that MX acted "solely" to prevent INV from receiving what it is entitled to. *Id.* These are "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). There are no allegations as to how or why the alleged restructuring led to a breach of the contract. Indeed, under Plaintiff's theory of the case, the alleged restructuring did not even affect INV's rights under the contract, since INV alleges that the restructured transaction still qualifies as a liquidity event.

In its briefing, INV attempts to fill the gap by arguing that MX, GoldBean, and Barratt "schem[ed] to hide the fact that there had been a Liquidity Event." Memorandum of Law in Opposition to MX's Motion to Dismiss, Dkt. No. 35, at 6. But there are two problems with this theory. First, it is not pled. Second, the theory is undercut by the facts that are alleged, rendering it implausible. The Complaint alleges that GoldBean's website states that it is defunct. *Id.* ¶ 13. According to the Complaint, this means that GoldBean has publicly disclosed that at

8

least a "Dissolution Event" has occurred, entitling INV to $200,000—and yet INV alleges that it has received nothing despite this disclosure. *Id.* ¶ 9(d), 15, 19, 20. Furthermore, the Complaint alleges that MX issued a press release announcing Barratt's hiring that was nearly identical to the one it was going to issue before the alleged restructuring. *Id.* ¶ 14. Even drawing all inferences in INV's favor, the Complaint alleges a brazen breach of the contract, not a furtive one. The tortious interference claim against MX must be dismissed.

### C. GoldBean's Declaratory Counterclaim is Dismissed, but Barratt's Is Not

GoldBean and Barratt both bring declaratory counterclaims seeking declarations that the "Proffered Equity Agreement" (i.e. the SAFE) is invalid and unenforceable, and that they have no payment obligations under it. *Id.* Amend. C.C. ¶¶ 72-73. INV argues that these declaratory claims are duplicative of its breach of contract claim. "In order to decide whether to entertain an action for declaratory judgment," the Second Circuit has "instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). As a result, courts reject declaratory judgment claims "when other claims in the suit will resolve the same issues." *EFG Bank AG v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 99 (S.D.N.Y. 2018).

As to GoldBean's claim, it is clear that the issue of the SAFE's validity and GoldBean's obligations under the SAFE would necessarily be resolved by INV's breach of contract claim. The only disputed issues in each claim are the same. GoldBean argues that the declaratory claim actually concerns a different agreement, because the breach of contract claim in the Complaint is pled as concerning the "Participation Agreement," Compl. ¶ 19 while the Counterclaims seek a

declaration with respect to the SAFE or "Proffered Equity Agreement." Amend. C.C. ¶ 73. This argument is too clever by half. INV simply sees the terms of the SAFE as being incorporated into the Participation Agreement by the obligation to deliver a SAFE on "reasonable and customary terms," as well as by GoldBean's alleged assent to the SAFE. Compl. ¶ 10, 17. Adjudicating the breach of contract claim will necessarily determine whether GoldBean is bound by the SAFE. The two claims do not refer to different agreements and there is no daylight between them. GoldBean's declaratory claim is dismissed.

As to Barratt, she argues that her declaratory claim is not duplicative, because INV's breach of contract claim is only against GoldBean, not her. Barratt notes that provisions of the SAFE purport to bind her as well as GoldBean. This argument has more merit. If INV prevails on its breach of contract claim in this action, that result would still have no preclusive effect as to any contract disputes between INV and Barratt. Barratt's declaratory counterclaim would allow her to litigate the same issues as those in the breach of contract claim. It would therefore eliminate redundant litigation, not create it, clearly "serv[ing] a useful purpose." *Duane Reade*, 411 F.3d at 389. The motion to dismiss her declaratory claim is denied.

### D. Barratt's Tortious Interference With Contract Claim Is Dismissed

Barratt also brings a tortious interference with contract counterclaim against INV. As noted above, such a claim "must allege (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch*, 449 F.3d at 401 (quotation omitted). This claim fails because the fourth element, an actual breach of the contract, is not adequately pled. The only relevant allegations in the Amended Counterclaims are that "INV improperly

caused MX to modify the terms of the Barratt Employment Agreement" and that "INV improperly caused MX to breach the Barratt Employment Agreement." Amend. C.C. ¶¶ 78-79. Besides being somewhat contradictory, these allegations are conclusory. There is no information as to how MX breached the contract. When it comes to pleading a claim "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

In briefing, Barratt attempts to salvage this claim by arguing that MX's abandonment of the would-be agreement to acquire GoldBean's assets was somehow a breach of the employment agreement with Barratt. But while the Amended Counterclaims allege that the two agreements were made in connection with one another, it also alleges that "[s]eparately [from the agreement to purchase GoldBean's assets], MX and Barratt negotiated and signed . . . the 'Barratt Employment Agreement.'" Amend C.C. ¶ 42. They additionally allege that the agreement to purchase GoldBean, unlike Barratt's employment agreement was never executed, meaning that it could not have been breached. *Id.* ¶ 88. The Amended Counterclaims' allegation that Barratt's employment agreement was breached is conclusory, and the tortious interference with contract claim must be dismissed.

### E.  Barratt's Tortious Interference With Prospective Business Advantage Claim Is Dismissed But GoldBean's Is Not

Both GoldBean and Barratt bring counterclaims for tortious interference with prospective business advantage. Under New York law these claims require showing that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (quotation omitted).

GoldBean's claim pleads all of these elements. INV argues that GoldBean failed to allege that the relationship was injured. But GoldBean alleges that but-for INV's interference, MX would have executed the would-be agreement with GoldBean. Amend. C.C. ¶ 88. INV also argues that GoldBean failed to sufficiently allege that INV acted for a wrongful purpose or used dishonest, unfair, or improper means. This argument fails as well because the Amended Counterclaims allege that INV acted fraudulently. *Id.* ¶¶ 91-92. Specifically, GoldBean has alleged that INV, through Hornblass, falsely asserted that GoldBean had a issued the SAFE, that its terms were valid, and that it was therefore entitled to a certain amount of money or equity. *Id.* ¶ 96. It further alleged that INV knew these assertions were false, *id.* ¶¶ 60-62, and that it intended for MX to rely upon them, *id.* ¶¶ 52-55, 57, 63. And GoldBean alleges that because of INV's misrepresentations, MX decided not to execute an agreement with GoldBean. Amend. C.C. ¶ 88. These are allegations of sufficiently wrongful conduct to support a claim for tortious interference with prospective business advantage.

Barratt's tortious interference with prospective business advantage claim, however, must be dismissed. Unlike GoldBean, her claim does not adequately allege that she suffered an injury. The Amended Counterclaims makes the conclusory assertion that "[d]ue to INV's tortious interference, GoldBean was damaged in amounts to be determined at trial." Amend. C.C. ¶ 103. In briefing, Barratt argues that she was hurt by the scuttling of the deal between MX and GoldBean for two reasons, neither availing. First, she argues that GoldBean's investors would have been compensated under the alleged terms of the deal. But the Amended Counterclaims themselves allege that Barratt herself was to be excluded from the pool of investors who would receive money. *Id.* ¶ 39. The benefits to other investors or of GoldBean itself cannot be attributed to Barratt. Second, Barratt argues that under the deal, she would have resolved debts

owed to GoldBean. But the only resolutions she cites to are the assumption of $40,000 of corporate debt personally guaranteed by Barratt and the write off of hundreds of thousands of dollars of loans that Barratt had made to GoldBean. *Id.* ¶ 41. These are not lost prospective business advantages but rather injuries that Barratt avoided. Barratt's tortious interference with prospective business advantage claims fails.

### F. GoldBean and Barratt's Unfair and Deceptive Business Practices Claims Are Dismissed

Finally, GoldBean and Barratt bring unfair and deceptive business practices claims under N.Y. Gen. Bus. Law § 349. They allege that INV "induc[es] startups, founders and entrepreneurs" to participate in its program and then tries to "forc[e] another set of financially onerous terms down their throats" after they have begun the program. *Id.* ¶ 106. To state a claim under § 349, GoldBean and Barratt must allege "(1) that the defendant's conduct is consumer oriented; (2) that the defendants is engaged in a deceptive act or practice; and (3) that the plaintiff was injured by this practice." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 83 (2d Cir. 2015) (quotation omitted).

These claims fail because GoldBean and Barratt do not allege consumer-oriented conduct. For purposes of § 349, consumers are defined as "those who purchase goods and services for personal, family or household use." *Sheth v. New York Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (N.Y. App. Div. 2000). This formulation has been adopted by numerous courts in this District. *See, e.g., Jones Real Estate, Inc. v. Avatel Techs., Inc.*, No. 18-cv-1949, 2019 U.S. Dist. LEXIS 39693, at *18 (S.D.N.Y. Mar. 12, 2019); *Fung-Schwartz, MD v. Cerner Corp.*, No. 17-cv-233, 2018 U.S. Dist. LEXIS 156646, at *16 (S.D.N.Y. Sept. 13, 2018); *Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 537 (S.D.N.Y. 2017); *AT&T Corp. v. Voice Stream Network, Inc.*, No. 15-cv-8155, 2017 U.S. Dist. LEXIS 15714, at *24 (S.D.N.Y. Feb. 2,

13

2017); *Forgione v. Gaglio*, No. 13-cv-9061, 2015 U.S. Dist. LEXIS 21644, at *46 (S.D.N.Y. Feb. 13, 2015); *Clayton v. Katz*, No. 10-cv-5755, 2012 U.S. Dist. LEXIS 137671, at *16 n.12 (Sept. 25, 2012); *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 265 (S.D.N.Y. 2011). Though "[a] plaintiff need not be a consumer to bring a claim under § 349 . . . the challenged conduct must affect consumers." *Axiom Inv. Advisors*, 234 F. Supp. 3d at 537.

The Amended Counterclaims lack any allegations consumers are harmed by INV. The alleged harms to startups and entrepreneurs do not qualify as consumer-oriented because they were not incurred while "purchas[ing] goods and services for personal, family or household use." *Sheth*, 709 N.Y.S.2d at 75; *see also Med. Soc'y v. Oxford Health Plans, Inc.*, 790 N.Y.S.2d 79, 80 (N.Y. App. Div. 2005) (dismissing § 349 claim because "Defendants' acts and practices are directed at physicians, not consumers"). And there are no allegations that other classes of individuals are harmed by INV's alleged conduct. The § 349 claims must be dismissed.

### G. All Dismissals Are With Prejudice

INV, as well as GoldBean and Barratt, have each been given opportunities to amend their Complaint and Counterclaims, respectively, following the filing of motions to dismiss. *See* Dkt. Nos. 29, 55. Therefore, the above dismissals are with prejudice.

### IV. CONCLUSION

For the reasons articulated above, MX's motion to dismiss is GRANTED. INV's motion to dismiss the Amended Counterclaims is GRANTED with respect to GoldBean's declaratory judgment claim, Barratt's tortious interference with contract claim, Barratt's tortious interference with prospective business advantage claim, and GoldBean and Barratt's § 349 claims. It is DENIED with respect to Barratt's declaratory judgment claim and GoldBean's tortious

14

interference with prospective business advantage claim. INV's earlier motion to dismiss the Counterclaims is DENIED as moot. All dismissals are with prejudice.

This resolves Dkt. Nos. 36, 45, 60.

SO ORDERED.

Dated: February 24, 2020
New York, New York

ALISON J. NATHAN
United States District Judge